| | |
|---|---|
| Kitellen Milo,<br>    *Plaintiff*,<br><br>    *v.*<br><br>James Galante,<br>    *Defendant*. | Civil No. 3:09cv1389 (JBA)<br><br><br><br>March 28, 2011 |

## RULING ON MOTION TO DISMISS

Plaintiff Kitellen Milo filed a Complaint on October 14, 2009 claiming that Defendant James Galante, through criminal actions for which he was indicted and pled guilty in *United States v. James Galante*, 3:06cr161(EBB), misappropriated funds in the trash companies that Milo co–owned with Galante. Plaintiff seeks recovery from Galante under the Civil Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. § 1962 (Counts One–Four); fraud (Count Five); statutory theft, Conn. Gen. Stat. § 52-564 (Count Six); conversion (Count Seven); breach of contract (Count Eight); breach of the covenant of good faith and fair dealing (Count Nine); breach of fiduciary duty (Count Ten); unjust enrichment (Count Eleven); gross negligence (Count Twelve); negligent misrepresentation (Count Thirteen); innocent misrepresentation (Count Fourteen); the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Fifteen); and the Connecticut Uniform Securities Act ("CUSA") (Count Sixteen). Pursuant to Federal Rule of Civil Procedure 12(b)(6), Galante moves [Doc. # 44] to dismiss Counts 1–7 and 10–16 on the ground that they are barred by the applicable statute of limitations; Counts 1–7, 10, and 15 on the ground that they fail to satisfy the pleading requirements of Rule 9(b), and Counts 15 and 16 on the ground that they fail to state a plausible claim for relief under CUTPA and

CUSA. For the reasons discussed below, Galante's Motion to Dismiss will be granted in part and denied in part.

I.      Factual Allegations

Milo alleges that at all times relevant to her Complaint, she and Galante served as co–owners of twenty–five waste disposal and recycling companies in and around Danbury, Connecticut (the "Companies"), with Mr. Galante owning a 60% interest in the companies and Ms. Milo owning the remaining 40% interest. (*Id.* ¶ 13.) On July 31, 1999, Milo and Galante entered into a Voting Trust Agreement by which Galante agreed to sell 40% of the common stock in the Companies to Milo, and Milo agreed to transfer the voting rights to her 40% interest to Galante. (*Id.* ¶ 14; Ex. B to Compl.) Under the trust agreement, Galante agreed to use his "best judgment," to act in "good faith," and to act without "gross negligence" in exercising his exclusive right to control the companies and vote the transferred shares. (Compl. ¶¶ 16–18.) Milo alleges that as a result, Galante was in a position of trust and was a fiduciary "with respect to Ms. Milo in relation to the Companies." (*Id.* ¶¶ 19–20.)

Milo claims that through the illegal acts set out in the indictment in Galante's criminal case, Galante "wrongfully and criminally diverted the Companies' assets for Mr. Galante's own personal use and profit." (*Id.* ¶¶ 21–22; Ex. A to Compl.) Galante entered into a plea agreement in his criminal case on September 3, 2008, and as part of that plea agreement he agreed to forfeit his interest in the Companies. (Compl. ¶¶ 23–25.) Milo alleges that in order to aid the Government, she agreed to transfer her 40% interest in the Companies to the Government so that it would be able to offer the Companies' assets for sale. (*Id.* ¶ 28.) Milo also claims that "[a]t least until the time of the Indictment, [she] had

no knowledge of Mr. Galante's criminal conduct . . . nor has she been charged with any criminal wrongdoing in relation to the Companies." (Compl. ¶ 29.)

## II.     Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kuck v. Danaher*, 600 F.3d 159, 162–63 (2d Cir. 2010). A complaint will not survive a motion to dismiss if it relies on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," or if "the well–pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S. Ct. at 1949–50.

## III.    Discussion

### A.     Timeliness of Motion to Dismiss

Milo urges the Court to deny the Motion to Dismiss in its entirety on the ground that it is untimely because Galante filed an Answer [Doc. # 28] on December 17, 2009, almost six months prior to his Motion to Dismiss. Milo argues that under Federal Rule of Civil Procedure 12(b) "[a] motion asserting any of [the 12(b)] defenses must be made before pleading if a responsive pleading is allowed." The defense of failure to state a claim is not waivable, however, and Rule 12(h) permits a defendant to raise to raise that defense even after the pleadings are closed. *See* Fed. R. Civ. P. 12(c), (h). "[A] motion to dismiss for failure to state a claim . . . that is styled as arising under Rule 12(b) but is filed after the close of pleadings, should be construed by the district court as a motion for judgment on the pleadings under Rule 12(c)," for which the standard "is identical to that of a Rule 12(b)(6) motion." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).

Galante's motion to dismiss is therefore not untimely, is construed as a Rule 12(c) motion for judgment on the pleadings, and is analyzed as if it were a Rule 12(b)(6) motion to dismiss.

B.      Civil RICO Claims: Counts 1 through 4

1.      Statute of Limitations

Galante argues that Milo brings her civil RICO claims more than four years after she reasonably should have discovered her alleged injuries, and accordingly moves to dismiss Counts 1–4 as time–barred. The conduct to which Galante pled guilty during his criminal case constitutes the "racketeering activity" upon which Milo bases each of the RICO Counts. (*See* Compl. ¶¶ 37–39, 46–47, 52, 60–62.) According to Galante, the FBI's execution of search warrants, the extensive media coverage of the FBI searches and seizures of Galante's property, and Galante's cessation of loan interest payments to Milo in July 2005 provided Milo sufficient inquiry or constructive notice of Galante's wrongful conduct more than four years before October 14, 2009, when she filed her Complaint.

The parties do not dispute that civil RICO claims must be brought within four years of the date that plaintiff "discovered or should have discovered the injury." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988); *see also World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009). The four–year limitations period begins to run when the plaintiff has either actual or inquiry notice of the injury. *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998). Where investors allege injury as the result of fraudulent activity, the Second Circuit has defined inquiry notice with respect to civil RICO claims as "notice such that a 'reasonable investor of ordinary intelligence would have discovered the existence of the fraud.'" *Id.* (quoting *Dodds v. Cigna Sec., Inc.*, 12 F.3d

346, 350 (2d Cir. 1993)). The information that gives rise to inquiry notice can come in the form of "storm warnings," which are "circumstances [that] would suggest to the reasonable investor of ordinary intelligence the probability that she has been defrauded." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005); *see Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 412–16 (2d Cir. 2008) (summarizing Second Circuit storm warnings case law); *see also World Wrestling Entm't*, 328 F. App'x at 697 (applying storm warnings doctrine to the civil RICO statute of limitations).

### a.      *Judicial Notice of Matters Outside the Complaint*

As an initial matter, Milo contends that the Court should deny Galante's motion on statute of limitations grounds because his notice inquiry argument is based, in large part, on materials outside the Complaint, and the issue of inquiry notice is ill–suited to consideration on a motion to dismiss. Galante responds that the Court has discretion to look beyond the Complaint and take judicial notice of the press coverage and "other documents" he attaches to his Motion to Dismiss in properly considering inquiry notice as part of a statute of limitations defense at the motion to dismiss stage. (Reply [Doc. # 56] at 3–5.)

Although it is "often inappropriate for resolution on a motion to dismiss," the Court can "readily resolve the issue of inquiry notice as a matter of law on a motion to dismiss . . . where the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint." *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 412 (2d Cir. 2008) (citations and internal quotation marks omitted). To that end, "it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their

5

contents, in deciding whether so–called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Id.* at 425 (emphasis in original) (the district court did not abuse its discretion in taking judicial notice of media reports, state court complaints, and regulatory filings where those materials "were offered to show that certain things were said in the press, and that assertions were made in lawsuits and regulatory filings, which is all that is required to trigger inquiry notice"). The Court may take judicial notice of these public records, however, only to establish the timing and existence of the information contained in them or the existence of litigation and related filings; the Court may not take judicial notice of the truth of the facts asserted in the media reports or legal filings. *See id.; Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (judicial notice inappropriate where the City's final decision denying Global's application for a franchise to maintain pay phones on City property and Global's president's testimony in criminal proceedings "were used not to establish their existence, but rather to provide the reasoned basis for the court's conclusion that 'the record shows that Global cannot be expected to pay its obligations to the City in a timely or honest manner").

Ordinarily, if matters outside the plaintiff's complaint are considered in evaluating a motion under Rule 12(b)(6) or Rule 12(c), the motion to dismiss is to be treated as if it were a motion for summary judgment. Fed. R. Civ. P. 12(b); *Global Network*, 458 F.3d at 156. However, if the Court confines its consideration of extraneous material to "matters of which judicial notice may be taken," those matters are not considered to be "outside the pleadings for purposes of conversion" and do not require that the Rule 12(b)(6) motion be converted to a summary judgment motion. *Staehr*, 547 F.3d at 425–26 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); 5C Charles Alan Wright & Arthur R.

Miller, *Federal Practice and Procedure* § 1366 & n. 33 (3d ed. 2004)).  It is therefore proper for this Court, in considering Galante's Motion to Dismiss, to take judicial notice of the *existence* of public records, such as news coverage and court filings, in considering Galante's inquiry notice arguments.

### b. Execution of Search Warrants on Locations in Which Milo Had an Interest

Galante argues that the FBI's execution of search warrants, starting on July 19, 2005, on numerous locations, including businesses that Milo had an interest in, constituted a storm warning that put Milo on inquiry notice of the wrongful conduct by Galante that forms the basis of Milo's claims.  To find that Milo was on inquiry notice of Galante's conduct by virtue of these searches, however, the Court would have to take judicial notice of the fact that locations in which Milo had an interest were actually searched.  The Court may properly take judicial notice of the warrants themselves, along with other filings in the criminal action against Mr. Galante, but using them to establish where the FBI searched would improperly use the judicial–notice function to adopt the truth of the contents of those filings.  *See Global Network*, 458 F.3d at 157.  Therefore, the Court will not take judicial notice of these warrants as a storm warning.

### c. Cessation of Interest Payments

Galante asks the Court to take judicial notice of records of Independent Monitor J. Allen Kosowsky that indicate that Milo stopped receiving monthly interest payments for loans to Galante's business as of July 22, 2005.  These payment records, however, are not materials of which the Court can properly take judicial notice.  First, Galante does not provide any documentation of these financial records such that the financial figures or the

public nature of the records can be verified. Second, Galante does not ask the Court to take judicial notice of the existence of these records, but to take judicial notice of the truth of the information contained therein, to wit, that Galante ceased making interest payments on loans in July 2005. This is not a proper function of judicial notice. *See Global Network*, 458 F.3d at 157.

*d.*      *News Coverage*

Galante also argues that the news coverage of the investigation Mr. Galante's criminal activity in July 2005 constituted storm warnings that put Milo on inquiry notice of Galante's wrongful actions. Galante attaches to his Motion to Dismiss a series of media transcripts and news articles that describe an FBI investigation into Galante's businesses including searches and seizures at both his home and his businesses. These transcripts and articles describe Government "probes" into Galante's sanitation businesses and mention, by name, Companies in which Milo had an ownership interest. For example, a transcript from the WTNH 6:00 p.m. television news broadcast on July 21, 2005 reads, in part:

> A probe into organized crime has investigators looking at 'sanitation' businesses in Connecticut and New York. Federal Authorities have raided more than two dozen trash hauling companies the past two days. New Haven leaders say . . . Investigators raided the office at the City's Municipal Transfer Station . . . Which is run by an outside contractor. Agents also searched the home and office of James Galante . . . Who owns 'Automated Waste Disposal' in Danbury . . . As well as the 'Danbury Trashers' minor league hockey team.

(8 WTNH Transcript July 21, 2005, Ex. B to Mot. to Dismiss at 17.) Automated Waste Disposal is one of the companies in which Milo had a 40% interest. (Compl. ¶ 13(a).) A July 20, 2005 article in the Hartford Courant similarly reads:

> FBI agents search an undisclosed number of homes and businesses in western Connecticut and suburban New York late Tuesday as part of an organized crime and political corruption case that centers on the refuse hauling business. Shortly after 5 p.m. Tuesday, dozens of agents began sifting through business records at the offices of Automated Waste Disposal Inc. in Danbury. . . . Automated is owned by James E. Galante, 52, of New Fairfield.

(Hartford Courant July 20, 2005, Ex. B to Mot. to Dismiss at 25.)

Similar articles appeared in The Journal News, based in Westchester, New York, The Connecticut Post, and Associated Press material concerning searches of Galante's trash–hauling businesses and mentioning Automated Waste Disposal by name. (Ex. B to Mot. to Dismiss.) Milo alleges in her Complaint that "Mr. Galante used the Companies for his own personal and criminal interest, all to the detriment of Ms. Milo." (Compl. ¶ 21.) As in *Staehr*, 547 F.3d at 425, it is proper to take judicial notice of the fact "that certain things were said in the press." These statements in the press, which directly related to the criminal activity complained of by Milo, constitute sufficient storm warnings to make a reasonably person of ordinary intelligence aware of likely injury. *See Lentell*, 396 F.3d at 168. Because these articles should have alerted Milo to Galante's fraud, Milo was on inquiry notice in July 2005. *See Staehr*, 547 F.3d at 427; *In re Merrill Lynch*, 154 F.3d at 60.

Milo argues that because she did not subscribe to any of the newspapers cited by Galante and because she lives in New York—and most of the cited articles were in Connecticut publications—these articles could not have put her on notice of Galante's fraud (*see* 11/23/10 Tr. at 6:17–7:20); however, she misinterprets the storm–warnings doctrine and its interplay with inquiry notice. Inquiry notice is distinct from actual notice in that it does not concern whether the investor actually knew about the fraudulent conduct but whether

that investor "should have discovered the fraudulent conduct." *Staehr*, 547 F.3d at 427. To that end, the storm–warnings doctrine focuses on whether the details contained in publicly available information would have suggested to an investor of ordinary intelligence "the probability that she has been defrauded," *Shah*, 435 F.3d at 250, regardless of whether the investor actually read the public available information. *Cf. id.*

Milo filed her Complaint on October 14, 2009, more than four years after these storm warnings, and her civil RICO claims are therefore time–barred.

### 2. Fraudulent Concealment

Milo asks the Court to toll the statute–of–limitations period for the civil RICO claims until the time of Galante's guilty plea on June 3, 2008 due to Galante's fraudulent concealment of his wrongful conduct. Standard tolling exceptions, including fraudulent concealment, apply to civil RICO actions. *Rhoades*, 859 F.2d at 1105. Under the doctrine of fraudulent concealment, the Court may toll the limitations period if the plaintiff establishes that: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999). A plaintiff who is not reasonably diligent in investigating the defendant's underlying wrongful conduct may not assert fraudulent concealment in a civil RICO case. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997); *see also Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000). In order to meet her burden, a plaintiff must plead the elements of fraudulent concealment with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *Chien v. Skystar Bio*

*Pharm. Co.*, 623 F. Supp. 2d 255, 265 (D. Conn. 2009); *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996). To comply with this requirement, "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).

Milo has failed to state with particularity those statements by Galante that she claims were false or misleading, and she has failed to state what due diligence she exercised during the statutory period. She does not allege any actions by Galante to conceal his fraud viz–à–viz her or anything about her inquiry following the media "storm warnings" of Galante's criminal business activities. Milo only alleges generally that Galante's acts, to which he pled guilty in the criminal action, "conceal[ed] Mr. Galante's fraudulent activities." (Compl. ¶ 38.) She relies entirely on *Lenz v. Associated Inns and Restaurants Co. of America*, 833 F. Supp. 362, 372 (S.D.N.Y. 1993) for the proposition that because Galante was her fiduciary, she can claim fraudulent concealment even without alleging any affirmative misrepresentation. However, as the court in *Lenz* explained, "[t]he defense of fraudulent concealment . . . does not function as a trump card on issues of due diligence and constructive knowledge." 833 F. Supp. at 373.

Even if Galante's failure to inform Milo of the facts underlying her civil RICO claims constitutes fraudulent concealment by virtue of their fiduciary relationship, Milo has still failed to plead any facts that suggest she diligently investigated her claims following media reports of Galante's criminal activity involving businesses that she and Galante co–owned or that she had no awareness of this coverage where she lived in Westchester county or

where her businesses were located in Danbury. That lack of due diligence is fatal to Milo's attempt to invoke fraudulent concealment to toll the statute of limitations for her civil RICO claims.

### 3. Separate Accrual

Milo also asks the Court to apply the "separate accrual rule" to her civil RICO claims and allow discovery on the exact dates of Galante's criminal misconduct so that she might recover for those discreet injuries that occurred within the four–year statute of limitations period. Under the "separate accrual rule," a plaintiff who claims injury as the result of a RICO scheme that otherwise falls outside the limitations period may recover for "new and independent" RICO violations that "begin[] the RICO limitations period afresh with each new injury." *In re Merrill Lynch*, 154 F.3d at 59 (citing *Bankers Trust*, 859 F.2d at 1103). However, in order for the limitations period to "begin afresh" for multiple injuries within a common scheme, each injury must "be new and independent in order to be actionable." *Id.* (citing *Bingham v. Zolt*, 66 F.3d 553, 559–61 (2d Cir. 1995)). Milo alleges in her Complaint one overall scheme of "criminally diverting the Companies' assets" for Galante's personal use. (Compl. ¶ 22.) She does not allege separate and distinct fraudulent acts by Galante. *See In re Merrill Lynch*, 154 F.3d at 59. Therefore, the Court will not apply the separate accrual rule to Milo's civil RICO claims, and Counts 1–4 will be dismissed.

### C. Tort Claims: Counts 5 through 7, 10, and 12 through 14; and Unjust Enrichment Claim: Count 11

#### 1. Statute of Limitations

Galante moves to dismiss Milo's tort claims—Count 5 (Fraud), Count 6 (Statutory Theft), Count 7 (Conversion), Count 10 (Breach of Fiduciary Duty), Count 11 (Unjust

Enrichment), Count 12 (Gross Negligence), Count 13 (Negligent Misrepresentation), and Count 14 (Innocent Misrepresentation)—on the ground that these claims are time–barred by the applicable three–year statute of limitations. Galante argues that the latest date that any of the tortious acts alleged by Milo could have occurred was June 9, 2006, when Mr. Galante lost control of his businesses and assets through forfeiture, which falls outside the three year limitations period. Milo does not dispute the three–year limitations period, but argues that the forfeiture actually took place on June 3, 2008, the date of Mr. Galante's guilty plea and that Galante cannot, therefore, prove that the limitations period has lapsed. Galante responds that in the criminal action, the court granted the Government's *ex parte* Motion for Restraining Order on June 9, 2006 and his businesses were therefore forfeit on that date.

Connecticut's statute of limitations for actions in tort, Conn. Gen. Stat. § 52-577, is an "occurrence statute," meaning that "the limitations period begins to run at the moment the act or omission complained of occurs"; the date that the injury occurred, and the plaintiff's discovery of the injury are irrelevant to the limitations analysis. *Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 310 (D. Conn. 2002) (citing *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988); *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996)). Milo's unjust enrichment claim is subject to this same three–year statute of limitations. *See Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 407 (2008) (equitable unjust enrichment claims that were based on the same factual allegations as legal conversion and statutory theft claims are subject to the same statute of limitations).

Galante's statute–of–limitations argument with respect to Milo's tort claims rests on the assumption that none of the complained–of acts or omissions could have occurred after

June 9, 2006, and therefore all tort counts are time–barred. Galante misinterprets the nature of the June 9, 2006 Order, however, in assuming that Galante had no control over the businesses he co–owned with Milo after that date. The June 9, 2006 Order was not an order of forfeiture but rather a restraining order that placed limitations on Galante's ability to manage his businesses and granted the United States Marshals Service special access to monitor Galante's businesses and financial accounts. (*See United States v. James Galante*, 3:06cr161(EBB) Restraining Order [Doc. # 134].) The June 9, 2006 Order does not make clear that Galante no longer had any control over the businesses co–owned with Milo or even that Galante fully complied with the terms of the Restraining Order. Galante's counsel represented during oral argument in this matter that according to the record of Galante's criminal case, Galante did not violate the terms of the Restraining Order. (Oral Arg. Tr. at 24:8–30:14.) As with respect to the search warrants executed in Galante's criminal case, however, Galante's compliance with the Restraining Order is not a fact that the Court may properly take judicial notice of. *See Global Network*, 458 F.3d at 157.

The defendant, in pleading a statute of limitations affirmative defense, bears the burden of proving that the plaintiff's claims are time–barred. *See Staehr*, 547 F.3d at 425. Galante has failed to meet that burden through his claim that the June 9, 2006 Order shows that "the latest date that any of the purported acts could have occurred was June 9, 2006," (Mem. Supp. at 16). The June 9, 2006 Order, on its own, does not demonstrate that Galante could not have committed wrongful diversions of the Companies' assets after that date. Although to do so would have been a violation of the Restraining Order, Galante does not meet his affirmative defense burden by asking the Court to assume that he did not violate

the Restraining Order.  The Court therefore denies Galante's Motion to Dismiss Milo's tort–based claims as time–barred.

### 2.  Rule 9(b) and "Fraud–Based" Claims

Galante also moves to dismiss Counts 5 (Fraud), 6 (Statutory Theft), 7 (Conversion), and 10 (Breach of Fiduciary Duty) for failure to comply with the Rule 9(b) particularity standard in setting out these "fraud–based" claims.  (Mem. Supp. at 17.)  Milo counters that her statutory theft, conversion, and breach–of–fiduciary–duty claims are not "fraud–based," and in any event, the Complaint is "sufficiently detailed" when read in light of the incorporated exhibits submitted with the Complaint.

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Milo argues that the Complaint meets this heightened standard by incorporating the "detailed allegations of Mr. Galante's scheme" contained in the criminal indictment against Galante, the Voting Trust Agreement, Mr. Galante's plea agreement, the criminal Judgment against Galante, and Galante's Change of Plea Transcript, each of which is an exhibit to her complaint.  (*See* Mem. Opp'n; Compl. Exs. A–E.)  Milo's counsel clarified at oral argument that the promise in the July 31, 1999 Voting Trust Agreement signed by Galante that he would use his best judgment and act in good faith and without gross negligence forms the basis of Count 5, the only claim explicitly based on fraud in the Complaint.  (Oral Arg. Tr. at 30:15–34:10; Compl. ¶¶ 14–18, 67–70.)  According to Milo's counsel, this was a false and misleading statement because at that time "he was already up to no good" as demonstrated by the indictment in Galante's criminal case.  (Oral Arg. Tr. at 34:20–36:3.)  By identifying the July 31, 1999 Voting Trust Agreement as a misleading statement and incorporating the

indictment—which alleges that as early as 1990, Galante was not acting in good faith with respect to the Companies—Milo has specified with particularity in Count 5 of her Complaint the circumstances constituting fraud.

Galante argues that Rule 9(b) applies to Counts 6 (Statutory Theft), 7 (Conversion), and 10 (Breach of Fiduciary Duty) as well as Count 5, describing these counts as "fraud–based" because they incorporate the same factual allegations as the fraud claim, and he claims that Milo has failed to comply with Rule 9(b)'s heightened pleading requirements with respect to these counts. "Rule 9(b) must be satisfied with respect to a particular count whenever fraud is a necessary element of that count," however "the mere fact that the transactions alleged in the amended complaint give rise to some claims grounded in fraud does not mean that all the claims rising out of the same transactions are subject to 9(b)." *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1390 (D. Conn. 1988) (to the extent that RICO count was based on "predicate acts of mail and wire fraud, it must satisfy Rule 9(b)," but to the extent that CUTPA claims alleged "unfair and deceptive acts" but did not rely on fraud as a necessary element, those claims need not satisfy Rule 9(b)). Only where allegations of fraudulent conduct form a necessary foundation for a claim must a plaintiff abide by the heightened standard of Rule 9(b). *See In re Xerox Corp. ERISA Litig.* 483 F. Supp. 2d 206, 216–17 (D. Conn. 2007) (citing *In re Elec. Data Sys. Corp. ERISA Litig.*, 305 F. Supp. 2d 658, (E.D. Tex. 2004)) (Rule 9(b) only applies to a breach of fiduciary duty claim where that claim alleges a breach of fiduciary duty on the basis of fraudulent conduct).

The applicability of Rule 9(b) to claims of negligent misrepresentation is illustrative of the distinction between claims that arise out of fraudulent conduct and those that are predicated on fraudulent conduct. District courts in the Second Circuit applying New York

law have found that allegations of negligent misrepresentation based on the same facts as allegations of fraud are subject to Rule 9(b) because such claims under New York law "require[] a showing that the misrepresentation was made for the very purpose of inducing action." *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 108 (S.D.N.Y. 2009). In contrast, negligent misrepresentation under Connecticut law does not require the same showing of fraudulent purpose, and thus 9(b) does not apply. *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 521 n.12 (D. Conn. 2005). Applying the underlying principal as in *In re Xerox*, 483 F. Supp. 2d at 216–17, a plaintiff must comply with Rule 9(b) only where a claim ultimately rests on an allegation that the plaintiff has been defrauded. *See Amata*, 693 F. Supp. at 1390.

Although Milo's Complaint includes a fraud claim, her breach of fiduciary duty claim is based on Galante's "pattern of self–dealing, diversion, misapplication and waste of corporate assets, all to the detriment of Ms. Milo" through which he breached Milo's "unique degree of trust and confidence." (Compl. ¶¶ 91–93.) Because her breach of fiduciary duty claim does not rest on the allegations of misrepresentation that her fraud claim does (*compare* Compl. ¶¶ 89–93, *with id.* ¶¶ 66–71), Count 10 is not subject to the heightened pleading standard of Rule 9(b). *See In re Xerox*, 483 F. Supp. 2d at 216–17. Milo's statutory theft and conversion claims are subject to this same distinction. Milo alleges in Count Six that Galante "wrongfully took, obtained and withheld property from Ms. Milo" (Compl. ¶ 73), and in Count Seven that he "converted, without authority or authorization, to his own use and enjoyment or to the use and enjoyment of his related entities, relatives, friends, or

cohorts, without authority to do so, property owned by Ms. Milo" (Compl. ¶ 75). Neither of these claims is predicated on allegations of fraud.

The Court therefore denies Galante's Motion to Dismiss with respect to Rule 9(b).

D.     CUTPA Claim: Count 15

1.     Statute of Limitations

CUTPA claims are subject to a three–year "occurrence" statute of limitations. *See* Conn. Gen. Stat. § 42–110g(f); *Willow Springs Condo. Ass'n v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 46 (1998). Galante argues that Milo's CUTPA claim in Count 15 is time–barred because, as with her tort and unjust enrichment claims, none of the acts that give rise to this claim could have occurred after the June 9, 2006 Order. For the reasons discussed above with respect to the tort claims, this argument is without merit.

2.     Rule 9(b) and CUTPA

Galante also argues that Count 15 of Milo's Complaint should be dismissed because, as he argues with respect to Counts 6, 7, and 10 above, Milo's CUTPA claim is subject to the heightened pleading standard of Rule 9(b). CUTPA claims brought in federal court, as with breach of fiduciary duty claims, "only must satisfy Rule 9(b) if such claims are *based on* fraud allegations." *Tatum v. Oberg*, 650 F. Supp. 2d 185, 195 (D. Conn. 2009). In Count 15, Milo alleges that through the "criminal actions described [in the Complaint] and as detailed in the indictment and guilty plea . . . Mr. Galante engaged in unfair methods of competition and/or unfair or deceptive acts or practices in the conduct of trade or commerce." (Compl. ¶ 119.) As with the breach of fiduciary duty, statutory theft, and conversion claims discussed above, although this CUTPA claim relies on the same set of underlying facts as Milo's fraud claims, there is nothing in Count 15 that suggests that it is actually based on allegations of fraud.

Count 15 is not therefore subject to the heightened pleading requirements of Rule 9(b).  *See Tatum*, 650 F. Supp. 2d at 195.

        3.      Failure to State a Claim Under CUTPA

Galante also argues that Count 15 of Milo's Complaint should be dismissed for failure to state a claim under CUTPA.  Specifically Galante argues that Milo has failed to allege any harmful actions by Galante "in the conduct of trade or commerce."

Under CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b.  In order to successfully state a claim for relief under CUTPA, a plaintiff therefore "must allege that the actions of the defendant were performed in the conduct of 'trade or commerce.'" *Muniz v. Kravis*, 59 Conn. App. 704, 711 (2000). CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."  Conn. Gen. Stat. § 42-110a.  In evaluating whether alleged actions were performed in the "conduct of any trade or commerce," the inquiry focuses not only on the nature of the acts themselves, but on the relationship between the actor and the allegedly injured party.  *Muniz*, 59 Conn. App. at 711; *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 670 (1992).  "It strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, cause by any person in the conduct of any trade or commerce."  *Vacco v. Microsoft Corp.*, 260 Conn. 59, 88–90 (2002) (quoting *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 724 (1993)).

In order for the actions to have been taken in the conduct of trade or commerce within the meaning of CUTPA, the injured party must be a consumer, competitor, or other businessperson that is harmed by the defendant's commercial business practices. *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 155 (2005) (listing as a factor for determining whether a practice is unfair under CUTPA "whether it causes substantial injury to consumers, [competitors or other businesspersons]"); *Muniz*, 59 Conn. App. at 711–15 (plaintiff did not properly allege that defendants' actions were performed in the conduct of trade or commerce where, although plaintiff rented an apartment from defendants, the use of that apartment was primarily in furtherance of the employee–employer relationship between plaintiff and defendants); *Quimby*, 28 Conn. App. at 670 (plaintiff's claim did not constitute a CUTPA violation because "[t]he relationship in this case is not between a consumer and a commercial vendor, but rather between an employer and an employee. There is no allegation in the complaint that the defendant advertised, sold, leased or distributed any services or property to the plaintiff."); *see also Banjeree v. Roberts*, 641 F. Supp. 1093, 1108 (D. Conn. 1986) ("Although an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purposes of CUTPA.") (citations omitted); *Moran Shuster, Carignan and Knierim v. August*, 43 Conn. Supp. 431, 435 (1994) ("This litigation is no more than a dispute between the defendant and his former partners as to the value of his capital account and the defendant's interest in the law firm upon his withdrawal. It is not a dispute between parties that were in any kind of consumer relationship with each other. The complaint does not involve trade or commerce for the purposes of CUTPA.")

Milo describes her relationship with Galante as that of "co–owners" of the Companies. (Compl. ¶ 8.) This relationship is not between a "consumer and a commercial vendor" or between two competitors. *See Quimby*, 28 Conn. App. at 670. Although the sale of a business is a transaction that could fall within the purview of CUTPA, *see Halo Tech Holdings, Inc. v. Cooper*, 3:07–CV–489(AHN), 2008 WL 877156, *18–*20 (D. Conn. March 26, 2008), "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 523 (2006). Even if the Voting Trust Agreement represents the sale of an interest in the Companies, that sale was merely incidental to the primary trade or commerce in which the Companies engaged—waste disposal. As a co–owner pursuant to the Voting Trust Agreement, Milo is accordingly neither a consumer of the services provided by the Companies in that primary trade or commerce nor a competitor. Milo's allegations therefore do not set forth a viable CUTPA claim, and Count 15 is dismissed.

### E.     CUSA: Count 16

Count 16 of Milo's Complaint alleges that Galante, "in connection with the offer, sale or purchase of a security, directly and indirectly engaged in dishonest and unethical practices" through his criminal actions and thereby violated CUSA. (Compl. ¶¶ 122–126.) Galante moves to dismiss this Count on the ground that the Voting Trust Agreement between Milo and Galante did not constitute the purchase or sale of a security, and thus CUSA does not apply. Galante relies primarily on the "economic reality" test employed in *McCloskey v. McCloskey*, 450 F. Supp. 991, 995 (E.D. Pa. 1978), and *Watts v. Des Moines Register & Tribune*, 525 F. Supp. 1311, 1319–20 (S.D. Iowa 1981), in arguing that because the

transfer of voting interest from Milo to Galante did not fundamentally change the nature of Milo's and Galante's interests in the companies and was entered into only for "economic practicalities," the transfer did not represent the sale of a security.

In *McCloskey*, a husband and wife entered into a voting trust agreement whereby the wife transferred her voting interest in common stock to her husband but retained all other rights normally associated with stock ownership as "a practical method of vesting authority to make everyday management decisions in one person who presumably was best equipped to operate the business profitably." 450 F. Supp. at 995. The Eastern District of Pennsylvania, in focusing on the "economic reality of the transaction," found that this did not resemble the purchase or sale of a security, but instead "reflect[ed] an internal management decision to provide plaintiff with a continuing interest in a corporation run temporarily by her husband." *Id.* Similarly, in *Watts*, the directors of a closely held media corporation entered into a voting trust and recapitalization agreement whereby a stockholder "exchange[d] eight shares of existing stock for one voting and seven nonvoting shares, with no change in equity interest," and "[t]he newly converted voting shares were then to be deposited by participating shareholders in the [voting] trust for a renewable term of ten years, and voting trust certificates were to be issued in exchange therefor." 525 F. Supp. at 1316. The Southern District of Iowa found that this was not the purchase or sale of securities because, as in *McCloskey*, the certificate holders "retained every right normally held by a shareholder with the exception of the right to vote," and "the creation of the voting trust did not effect that fundamental change in the nature of participants' investments which is essential to a judicial finding of a purchase or sale." *Id.* at 1319.

The United States Supreme Court later clarified that the "economic realities" test only applies to "unusual instruments not easily characterized as 'securities.'" *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690 (1985).  In *Landreth*, the Supreme Court held that because the instrument involved was "traditional stock, plainly within the statutory definition" there was no need "to look beyond the characteristics of the instrument to determine whether the Acts apply."  *Id.*  Accordingly, voting trust agreements that involve exchanges of voting rights for stock without any "unusual" characteristics and fall within ordinary statutory definitions are not subject to the economic realities test.  *See Disher v. Fulgoni*, 161 Ill. App. 3d 1, 10 (1987).

The voting trust agreement between Milo and Galante, as alleged by Ms. Milo, does not include any of the unusual characteristics of the agreements in *McCloskey* and *Watts*, and instead, as alleged, represents an ordinary exchange of voting rights for common stock.  Under the agreement, Galante sold 40% of the common stock in the Companies in exchange for Milo's transfer of the voting rights to her 40% interest in the Companies.  (Compl. ¶ 14.)  This was not an agreement through which partners or family members appear to simply reorganize the voting rights of a company in the course of internal management under the guise of a voting trust agreement.  *See McCloskey*, 450 F. Supp. at 995; *Watts*, 525 F. Supp. at 1319.  Without the unusual circumstances seen in *McCloskey* and *Watts*, the economic realities test does not apply here, *Landreth*, 471 U.S. at 690, and the voting trust agreement falls within the definition of "security" under CUSA.  Conn. Gen. Stat. § 36b-3(19).[1]

---

[1] Section 36(b)–3(19) reads:

"Security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation

23

Accordingly, Milo has alleged the purchase or sale of a security within the meaning of CUSA and has therefore stated a plausible claim under CUSA.

IV.    Conclusion

For the reasons stated above, Galante's Motion to Dismiss [Doc. # 44] is GRANTED as to Counts 1–4 and 15 of Milo's Complaint and DENIED as to all other Counts.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of March, 2011.

---

in any profit-sharing agreement, interests of limited partners in a limited partnership, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral rights, put, call, straddle, option, or privilege on any security or group or index of securities, including any interest in or based on the value of such security, group or index, put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" includes (A) a certificated and an uncertificated security, and (B) as an "investment contract", an interest in a limited liability company or limited liability partnership, but does not include any insurance or endowment policy or annuity contract issued by an insurance company that is subject to regulation by the Insurance Commissioner.

(emphasis added)