UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Kitellen Milo,
    *Plaintiff*,

                                                    Civil No. 3:09cv1389 (JBA)

    *v.*

James Galante,
    *Defendant*.

                                                    July 9, 2012

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Kitellen Milo filed a Complaint against Defendant James Galante on October 14, 2009, alleging violations of the Civil Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. § 1962 (Counts One–Four); fraud (Count Five); statutory theft, Conn. Gen. Stat. § 52-564 (Count Six); conversion (Count Seven); breach of contract (Count Eight); breach of the covenant of good faith and fair dealing (Count Nine); breach of fiduciary duty (Count Ten); unjust enrichment (Count Eleven); gross negligence (Count Twelve); negligent misrepresentation (Count Thirteen); innocent misrepresentation (Count Fourteen); violations of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Fifteen); and violations of the Connecticut Uniform Securities Act ("CUSA") (Count Sixteen). On March 28, 2011, the Court granted in part and denied in part Defendant's Motion to Dismiss, dismissing Counts One through Four and Fifteen. *See Milo v. Galante*, 3:09cv1389 (JBA), 2011 WL 1214769 (D. Conn. Mar. 28, 2011). Defendant now moves [Doc. # 93] for summary judgment on all remaining counts. For the reasons that follow, Defendant's motion will be granted in part and denied in part.

I.      Relevant Undisputed Facts

On July 31, 1999, Ms. Milo and Mr. Galante entered into a Voting Trust Agreement ("Agreement") in which Mr. Galante agreed to sell 40% of the common stock in waste disposal companies owned by Galante in and around Danbury, Connecticut (the "Companies"). (Agreement, Ex. 3 to Def.'s Loc. R. 56(a)1 Stmt [Doc. # 93–1].) Attorney Jack Garamella, who represented Automated Waste Disposal in connection with the Agreement, testified during his deposition in this case that although Ms. Milo was the "record owner" of the Companies pursuant to the Agreement, her husband, Thomas Milo, was the "actual owner" and used Ms. Milo as a "straw man." (Garamella Dep., Ex. 4 to Def.'s 56(a)1 Stmt at 54:4–55:5.) Attorney Garamella also testified, however, that there was no written contract that showed that Mr. Milo was the "actual owner" and that the stock in the Companies was issued to Ms. Milo. (*Id.* at 55:6–56:4.)

Ms. Milo paid approximately $14 million to Mr. Galante in exchange for the common stock in the Companies, in the form of a July 31, 1999 promissory note in the amount of $6,957,730.00 (Ex. 23 to Pl.'s Loc. R. 56(a)2 Stmt [Doc. # 98]) and a May 16, 2000 check in the amount of $7,995,000.00 (Ex. 22 to Pl.'s 56(a)2 Stmt). She testified during her deposition that this money was provided by Thomas Milo as a gift, but then later agreed that in purchasing the Companies she was acting as "an extension" of Mr. Milo and that it was "as though Mr. Milo was doing it himself." (Milo Dep., Ex. 9 to Def.'s 56(a)1 Stmt at 122:19–125:1.) Ms. Milo did not discuss the Agreement or the Companies with Mr. Galante prior to signing the Agreement. (*See id.* at 43:2–20; Galante Dep., Ex. 8 to Def.'s 56(a)1 Stmt at 26:5–24.) Ms. Milo received regular payments from the Companies, and assumed that the

checks that she received were "payments of loans" because she had been directed by Mr. Milo to make loans to the Companies.  (Milo Dep. at 95:19–99:9.)

On June 8, 2006, an Indictment was filed against Mr. Galante in *United States v. James Galante*, 3:06cr161(EBB), charging him with racketeering and other related criminal offenses.  (Indictment, Ex. 10 to Def.'s 56(a)1 Stmt.)  On the same day, Judge Burns entered a Restraining Order that "restrained, prohibited, and enjoined from attempting or taking any action that would affect the availability, marketability, or value" of the twenty–five Companies that Ms. Milo alleges in her Complaint that she held a 40% interest in pursuant to the Agreement.  (Restraining Order, Ex. 1 to Def.'s 56(a)1 Stmt at 3, Ex. A; Compl. [Doc. # 1] ¶ 13.)  The Restraining Order prohibited "selling, conveying, transferring, distributing, bailing, assigning, mortgaging, pledging, collateralizing, hypothecating, encumbering, wasting, secreting, damaging, failing to preserve and maintain, diminishing the value of, disposing of, or removing from the jurisdiction of this Court, all or any party of their interest, direct or indirect," in any of the Companies.  (Restraining Order at 3.)  It further set "special conditions" for the Companies, including that each would "maintain its existing service to all customers in compliance with all existing contracts," "operate in compliance with all applicable federal, state, and local laws and regulations," follow Generally Accepted Accounting Principles, cede discretion to the United States Marshals Service in requiring new practices for customer payments and reviewing and pre–approving transactions, and not conduct any transaction except in the ordinary course of business.  (*Id.* at 6–8.)

A June 30, 2006 Order Setting Conditions of Release confined Mr. Galante to his home at 10 Weldon Woods Road and ordered that he "have no direct or indirect contact

with any known co–defendants, witnesses, gang members, or targets of the investigation outside the presence of [his] lawyer and/or [his] lawyer's designee," that he submit to electronic monitoring, that he "have pen register installed on all land telephones at 10 Weldon Woods Road," that he "not possess or have access to any cell phones" and that "[n]o cell phones shall be allowed in the home at 10 Weldon Woods Road," and that he "not use a computer and no computers are allowed in the home at 10 Weldon Woods Road." (Conditions of Release Order, Ex. 2 to Def.'s 56(a)1 Stmt.)

When asked during his deposition in this case whether he did any work related to the Companies after June 2006, Mr. Galante answered: "Absolutely not." (Galante Dep. at 43:17–19.) In response to whether he ever visited the Companies after June 2006 he answered "I was on house arrest." (*Id.* at 43:20–22.) He further testified that when individuals who were permitted to visit him told him that the Companies were "falling apart" and "being run into the ground" under the Government's stewardship, he relayed that information to his attorney, Hugh Keefe, and appeared before Judge Burns with his concerns. (*Id.* at 43:23–45:15.) Attorney Garamella testified that Mr. Galante ran the Companies with Mr. Milo until Mr. Galante was indicted on June 8, 2006, at which point Judge Burns named Leonard Briskman as a monitor and directed the U.S. Marshals Service to "take over operations." (Garamella Dep. at 115:21–116:22.) Mr. Garamella further stated that Mr. Galante did not have any role in the Companies after June 8, 2006, and that he was only aware of Mr. Galante speaking with Mr. Briskman and Terry Brotherton, whom the Marshals Service brought in "to run the Companies until Mr. Galante pled guilty," in connection with the Companies. (*Id.* at 116:25–118:5.)

Matthew Starr, the operations manager of the Companies from 2009 to 2011, testified in deposition that he was not aware of Mr. Galante having any role in the management of the Companies after being placed on home arrest.  (Starr Dep., Ex. 11 to Def.'s 56(a)1 Stmt at 97:22–98:9.)  Paul DiNardo, who was appointed interim CEO of the Companies by the Government in June 2006 and served in that position until October 2007, similarly testified that Mr. Galante did not work with the Companies after June 2006, because he "was not allowed, except through attorneys, to have any input."  (DiNardo Dep., Ex. 12 to Def.'s 56(a)1 Stmt at 74:10–16.)  Ronald Zollo, controller at Automated Waste Disposal from 2001 to 2009, also testified that after the June 2006 Indictment, Mr. Galante "was away" and "was kept home."  (Zollo Dep., Ex. 13 to Def.'s 56(a)1 Stmt at 49:15–50:7, 52:22–53:23.)  Jane Kapitan, who served as controller at Automated Waste Disposal starting in 2009, after the U.S. Marshals Service assumed control of the Companies, testified that she has never met, spoken to, or received any communications from Mr. Galante.  (Kapitan Dep., Ex. 14 to Def.'s 56(a)1 Stmt at 58:8–15.)

David Dunleavy, a former general manager of Automated Waste Disposal, testified however, that he believed that Mr. Galante was involved in the running of the Companies from 2006 to 2008.  (Dunleavy Dep., Ex. 15 to Def.'s 56(a)1 Stmt at 36:5–11.)  He based this belief on Mr. Galante's conversations at his house with Terry Brotherton, along with employees such as mechanic Jack Mazza and Bobby Gallanello.  (*Id.* at 36:12–38:21.)  Mr. Dunleavy clarified, however, that he was not aware of "[w]hat they talked about or how it related to the running of the company," and that he was assuming that Galante was involved in the Companies on "just a perception":

> There's just a perception, and it's perception and assumptions.  Whatever
> that and a dollar gets you, a cup of coffee, that he had some control over the
> companies, because—you know, why would the CEO go up and talk to him
> every Friday?  But he never told me that [Mr. Galante] said, "Do this, do
> that."

(*Id.* at 38:22–39:15.)

On June 3, 2008, Mr. Galante entered into a plea agreement with the Government,
under which he agreed to plead guilty to racketeering conspiracy in violation of 18 U.S.C.
§ 1962(d), conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and conspiracy
to defraud the IRS in violation of 18 U.S.C. § 371.  (Plea Agreement, Ex. 5 to Def.'s 56(a)1
Stmt.)  Pursuant to the plea agreement, Mr. Galante agreed "to forfeit the entirety of his
interests in each and every one of the twenty–five (25) companies that are named in the
Superseding Indictment."  (*Id.* at 3.)

During her deposition in this case, Ms. Milo was asked if she was harmed when the
Government began investigating the Companies in 2005, at which time she stopped
receiving regular payments from the Companies, and she answered: "Not really."  (Milo Dep.
at 120:6–121:11.)  Ms. Milo later clarified that this meant: "My finances never really changed.
Financially, whatever I was missing, Tom [Milo] just gave it to me."  (*Id.* at 139:3–12.)  She
also testified that in her dealings with Mr. Galante and the Companies, she acted as "an
extension" of Mr. Milo and that it was "as though Mr. Milo was doing it himself."  (*Id.* at
122:19–125:1.)

Despite this testimony, Ms. Milo submits an affidavit in connection with her
opposition to Mr. Galante's motion for summary judgment in which she reiterates that she
paid Mr. Galante "a check in the amount of $7,985,000 and signed a promissory note in the
amount of $6,957,730" in exchange for the 40% interest in the Companies, and states that

6

"[b]y signing the Trust Agreement, Mr. Galante promised to act using his best judgment, in good faith, and without gross negligence," that she has "been harmed by Mr. Galante's failure to adhere to that standard of behavior," and that "[a]s a result of Mr. Galante's actions, I was unable to realize the full value of my investment in the Companies." (Milo Aff., Ex. 18 to Pl.'s 56(a)2 Stmt ¶¶ 2–5.) Ms. Milo also submits an expert report prepared by the accounting and consulting firm Meyers, Harrison, & Pia, LLC, which concludes that on December 31, 2004, prior to the investigation into and seizure of the Companies by the Government, Ms. Milo's 40% interest in the Companies was worth $12,100,000.00. (Valuation Report, Ex. 17 to Pl.'s 56(a)2 Stmt at 9.) Mr. Dunleavy, Ms. Kapitan, and Mr. Zollo testified that the Companies lost business and were forced to offer price reductions following Mr. Galante's Indictment and the control of the Companies by the Government. (Dunleavy Dep. at 42:21–43:1; Kapitan Dep. at 54:10–19; Zollo Dep. at 51:13–52:20.) On March 28, 2011, the Companies were sold for a total of $18,000,000. (Amendment to Asset Purchase Agreement, Ex. 24 to Pl.'s 56(a)2 Stmt ¶ 5.)

II.    Discussion[1]

Defendant James Galante argues that he is entitled to summary judgment on Ms. Milo's tort and equitable claims—fraud (Count Five), statutory theft (Count Six), conversion

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

(Count Seven), breach of fiduciary duty (Count Ten), unjust enrichment (Count Eleven), gross negligence (Count Twelve), negligent misrepresentation (Count Thirteen), innocent misrepresentation (Count Fourteen)—because those claims are barred by the applicable three–year statute of limitations; that he is entitled to summary judgment on Ms. Milo's breach of contract (Count Eight) and breach of the covenant of good faith and fair dealing (Count Nine) claims because Ms. Milo admits to not suffering any damages; and that he is entitled to summary judgment on Ms. Milo's CUSA claim (Count Sixteen) because the undisputed facts fail to show a violation of that statute.

A.      Statute of Limitations

Under Connecticut law, "no action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577. This statute of limitations for actions in tort is an "occurrence statute," meaning that "the limitations period begins to run at the moment the act or omission complained of occurs"; the date that the injury occurred, and the plaintiff's discovery of the injury, are irrelevant to the limitations analysis. *Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 310 (D. Conn. 2002) (citing *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988); *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996)). Ms. Milo's unjust enrichment claim is subject to this same three–year statute of limitations. *See Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 407 (2008) (equitable unjust enrichment claims that were based on the same factual allegations as legal conversion and statutory theft claims are subject to the same statute of limitations).

Mr. Galante argues that it is undisputed that he complied with the terms of the restraining and home confinement orders imposed in his criminal case, and that therefore

8

the last date that he could have committed any of the alleged misconduct with respect to the Companies was June 9, 2006, the date of the Restraining Order. He further argues that because Ms. Milo filed her Complaint on October 14, 2009, it falls outside the three–year limitations period of Conn. Gen. Stat. § 52-577. Ms. Milo argues in response that there are genuine factual disputes as to whether Mr. Galante actually ceded control of the Companies on June 9, 2006, whether the statute of limitations is tolled by Mr. Galante's continuing failure to inform Ms. Milo of his criminal conduct, and whether the statute of limitations is tolled by Mr. Galante's fraudulent concealment of his criminal acts.

The undisputed factual record demonstrates that the last date that Mr. Galante could have committed any of the criminal acts alleged in the Complaint is June 8, 2006. The June 8, 2006 Restraining Order prohibited Mr. Galante from taking any action with respect to the Companies. It further set special conditions that required the Companies to be operated in compliance with all applicable laws and regulations and ceded control and discretion in the management of the Companies to the U.S. Marshals Service. Mr. Galante's Release Order restricted him to home confinement on June 30, 2006, and he testified at his deposition in this case that he did not do any work related to the Companies after June 2006. Attorney Garamella, operations manager Matthew Starr, interim CEO Paul DiNardo, controller Ronald Zollo, and controller Jane Kapitan all testified that Mr. Galante had no involvement with the Companies except to the extent he was permitted to have input through his attorneys.

Only former general manager David Dunleavy claimed that Mr. Galante had any involvement with the Companies after June 2006, but admitted that he based that belief only on the fact that Mr. Galante met with Terry Brotherton, who had been appointed by the U.S.

Marshals Service to run the companies, and two other employees, Jack Mazza and Bobby Gallanello, and that he did not know what Mr. Galante talked about with these individuals. Mr. Dunleavy testified that "[t]here's just a perception, and it's perception and assumptions" that Mr. Galante was involved in the Companies, but did not rely on anything other than this hunch in postulating that Galante played a role in running the Companies after June 2006. (Dunleavy Dep. at 36:5–39:15.) At oral argument, Ms. Milo's counsel argued that this testimony by Mr. Dunleavy, combined with Mr. Galante's eventual guilty plea, are evidence of Mr. Galante's continuing course of conduct with respect to the Companies.

In light of the overwhelming evidence that Mr. Galante complied with the terms of the Restraining Order insofar as he neither managed the Companies after June 8, 2006 nor committed any wrongful diversions of the Companies' assets after that point, Mr. Dunleavy's "perception and assumptions" testimony that Galante was involved after June 2006 is insufficient to demonstrate a triable issue of fact, nor does Mr. Galante's guilty plea in any way relate to conduct in connection with the Companies that occurred after June 2006. In ruling on Mr. Galante's motion to dismiss, the Court explained that it was Mr. Galante's burden to prove that Ms. Milo's claims were time–barred by showing that Mr. Galante could not have committed any tortious conduct after June 9, 2006. *See Milo*, 2011 WL 1214769 at *8. Mr. Galante has met that burden here on summary judgment.

Where a party moving for summary judgment has carried its burden and "has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts . . . or on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982

(2d Cir. 1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Such a claim must rely on "more than a 'scintilla of evidence,'" *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), and bald assertions or conclusory allegations do not create a genuine issue of material fact, *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Del. & Hudson*, 902 F.2d at 178. If the nonmoving party cannot come forward with sufficient evidence to demonstrate a genuine issue of material fact and "the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citations and internal quotation marks omitted). Mr. Dunleavy's testimony is, by his own characterization, conjecture or surmise, and thus does not create a genuine issue for trial.

Ms. Milo's claims that the statute of limitations is tolled by Mr. Galante's failure to inform her of his conduct, or by his fraudulent concealment, lack merit. "When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 241 (1980). The course of conduct upon which Ms. Milo sues Mr. Galante, however, is not a failure to inform Ms. Milo of the nature of his conduct with respect to the Companies, but his use of the Companies "for his own personal and criminal interest, all to the detriment of Ms. Milo." (Compl. ¶ 21.) The undisputed facts demonstrate that this course of conduct, Mr. Galante's diversion of funds from the Companies for his own personal use, ceased as of June 9, 2006. With respect to Ms. Milo's fraudulent concealment claim, "[i]n order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it." *Beckenstein v. Potter & Carrier, Inc.*, 191

Conn. 150, 163 (1983).   Nowhere in her Complaint did Ms. Milo raise fraudulent concealment, therefore she is barred from asserting it at this point in response to Mr. Galante's statute of limitations defense.

The undisputed facts demonstrate that Ms. Milo brought her tort and equitable claims more than three years after the last date when Mr. Galante could have committed the actions complained of.   Mr. Galante's motion for summary judgment on these claims is therefore granted.

B.   Contract Claims

"It is well settled that in order to recover for breach of contract, a plaintiff must prove that he or she sustained damages as a direct and proximate result of the defendants' breach." *Warning Lights & Scaffold Serv., Inc. v. O & G Indus., Inc.*, 102 Conn. App. 267, 271 (2007) (trial court properly directed a verdict for defendant on breach of contract claim where the plaintiff's claimed damages were legal fees and expenses incurred, but where "all of the evidence submitted at trial established that the plaintiff's insurance company paid all of the plaintiff's legal fees and expenses in the underlying litigation").   A claim for breach of the implied covenant of good faith and fair dealing similarly requires that the plaintiff have been injured:

> A claim for breach of the implied covenant of good faith and fair dealing requires three elements: (1) two parties must engage in a contract which the plaintiff reasonably expects to benefit; (2) the benefit is in some way injured by the other party's actions; and (3) these injurious actions were the product of the defendant's bad faith.

*Owen v. Georgia–Pacific Corp.*, 389 F. Supp. 2d 382, 393 (D. Conn. 2005) (Squatrito, J.).

Mr. Galante argues that Ms. Milo's breach of contract and breach of the covenant of good faith and fair dealing claims must fail because she has not been damaged or injured,

12

as evidenced by her deposition testimony that she did not pay for her 40% interest in the Companies and that her finances have not changed as a result of Mr. Galante's conduct. Ms. Milo argues in response that her testimony that she was not harmed meant only that her lifestyle did not change as a result of Mr. Galante's conduct, that a jury could reasonably conclude based solely on Mr. Galante's admissions in his guilty plea that Ms. Milo was harmed, that she states in her affidavit that she was harmed, and that her uncontroverted expert report demonstrates that her 40% interest was impaired. Her counsel further posited at oral argument that Ms. Milo need not be able to delineate a specific dollar amount in damages to demonstrate that she has been damaged by Mr. Galante's alleged breach; that her interest in the Companies decreased in value as a result of Mr. Galante's breach suffices to demonstrate damage, regardless of where the money for her investment in the Companies came from or whether her lifestyle changed as a result of the loss in value.

Ms. Milo testified during her deposition in this case that the money she paid Mr. Galante for the 40% interest in the Companies was provided by Thomas Milo. In response to whether the funds were given to her by Mr. Milo as "a gift," she responded, "I guess so, yes," but also testified that she "[n]ever asked" exactly what the money was that Mr. Milo provided for the purchase. (Milo Dep. at 122:24–124:1.) She then proceeded to agree that she was just acting as "[a]n extension" of Mr. Milo, that it were as though Mr. Milo were making the purchase himself, and that there was no question in her mind that "[t]his is really all Tommy Milo, not Kitellen Milo." (*Id.* at 124:2–125:1.) Attorney Garamella similarly testified that Ms. Milo was the "record owner" of the Companies and that the stock was issued to Ms. Milo, but that Mr. Milo was the "actual owner" and used Ms. Milo as a "straw man." (Garamella Dep. at 54:4–56:4.) When asked if she was harmed, Ms. Milo answered

13

"[n]ot really" (*id.* at 121:7–11), and later clarified that this meant: "My finances never really changed.  Financially, whatever I was missing, Tom just gave it to me" (*id.* at 139:3–12).

Regardless of whether Thomas Milo used Ms. Milo as a "straw" on the paper documents, while putting up the money for the 40% interest himself, Ms. Milo is the record owner of that 40% interest and is a party to the Agreement with Mr. Galante.  It is Ms. Milo's 40% interest that suffered a loss in value according to her expert's valuation.  Even if Mr. Milo provided the funds for that interest, and even if Ms. Milo's lifestyle remained unaffected by Mr. Galante's breach, she owned a 40% interest in the Companies under the Agreement, and there is evidence in the record that her interest lost value.  A reasonable jury could therefore conclude that Ms. Milo sustained damages as a result of Mr. Galante's conduct.  Mr. Galante's motion for summary judgment on Ms. Milo's breach of contract and breach of the covenant of good faith and fair dealing claims is therefore denied.

C.   CUSA Claim

Mr. Galante argues that he is entitled to summary judgment on Ms. Milo's claim under CUSA on the ground that the undisputed facts demonstrate that none of Mr. Galante's conduct related to the sale of a security or any untrue statements made in connection with the sale of a security.  Ms. Milo argues in response that a jury could reasonably conclude that Mr. Galante promised in the Agreement to use his best judgment and act in good faith and that he failed to act in accordance with that promise.  To this, Mr. Galante responds that Ms. Milo's clarification of the claimed CUSA violation demonstrates that her CUSA claim is time–barred by the five–year limitations period in Conn. Gen. Stat. § 36b-29(f).

14

CUSA provides in relevant part:

> No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Conn. Gen. Stat. § 36b-4(a). The relevant CUSA statute of limitations provides that

> with respect to actions arising out of intentional misrepresentation or fraud in the purchase or sale of securities, no person may bring an action more than two years from the date when the misrepresentation or fraud is discovered or in the exercise of reasonable care should have been discovered, except that no such action may be brought more than five years from the date of such misrepresentation or fraud.

*Id.* § 36b-29(f).

It is undisputed that Ms. Milo and Mr. Galante entered into the Agreement on July 31, 1999, and that Ms. Milo filed her Complaint more than ten years later, on October 14, 2009. Ms. Milo's counsel claimed at oral argument that the untrue statements made in connection with sale of the 40% interest in the Companies included not only the Agreement itself, but all of Mr. Galante's conduct up until 2006, in that his conduct after signing the Agreement was "indirectly" connected with the sale of the security in 1999. CUSA, by its terms however, prohibits untrue statements made in connection "with the offer, sale or purchase of any security." Conn. Gen. Stat. § 36b-4(a). The statutory definition of sale "includes every contract of sale of, contract to sell, or disposition of, a security or interest in security for value." *Id.* § 36b-3(16)(A). Since Ms. Milo never spoke to Mr. Galante about the sale reflected in the Agreement dated July 31, 1999, her claims of misrepresentation are

limited to Mr. Galante's representation in that Agreement that he would use his best judgment, in good faith and without gross negligence, when in fact at the time the Agreement was executed he was engaged in fraudulent mismanagement of the Companies and intended to continue that practice.

The misrepresentations charged by Ms. Milo necessarily occurred when the Agreement conveying the 40% interest to her was signed on July 31, 1999, and by filing her Complaint on October 14, 2009, Ms. Milo brought her CUSA claims more than five years after the date of those misrepresentations in connection with the purchase and sale effected by the Agreement.  Thus, Ms. Milo's CUSA claim is time–barred, and Mr. Galante's motion for summary judgment on this claim is granted.

III.   Conclusion

For the reasons stated above, Defendant's motion [Doc. # 93] is granted in part and denied in part.  Counts Eight and Nine of Plaintiff's Complaint remain for adjudication; all other Counts are dismissed.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of July, 2012.

16